2024 UT App 74

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JERAD GOURDIN,
Appellant.

Opinion
No. 20200091-CA
Filed May 16, 2024

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 181402519

Douglas J. Thompson and Jennifer L. Foresta,
Attorneys for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1      A jury convicted Jerad Gourdin of murdering a sixty-year-old woman (Victim) in her home during an apparent burglary. Gourdin appeals that conviction, asserting that his trial attorneys rendered constitutionally ineffective assistance. In particular, Gourdin asserts that his attorneys should have objected to the State's effort to introduce recordings of his police interviews, and that they should have done more to investigate the DNA issues in the case, including requesting copies of the State's DNA experts' files and consulting with a DNA expert of their own. We conclude that Gourdin's attorneys did not render ineffective assistance in deciding not to object to admission of the police interviews. But

we find merit in some of Gourdin's arguments regarding the DNA issues, and on that basis we reverse his conviction and remand this case for further proceedings, including a new trial.

## BACKGROUND[1]

### *The Day of the Murder*

¶2      In 2014, Victim lived with her adult son (Son) in a small house in a usually quiet and "safe" neighborhood. Shortly before 4:00 p.m. on May 21, Son came home from work and found his mother's lifeless body on the living room floor; she had been strangled with an electrical cord that had apparently been taken from the back of a "boombox." Chemicals that Son thought smelled like bleach had been dumped on Victim's body. Son began screaming for help; the next-door neighbor heard his cries and rushed over to the house. Son attempted to perform CPR, but his efforts were unavailing. While Son was attending to Victim, the neighbor called 911. When paramedics arrived, they quickly determined that there was nothing they could do for Victim.

¶3      Gourdin—who had just recently been released from prison—was living in a house two doors down from where Victim and Son lived. The owner of this house was caring for Gourdin's one-year-old daughter, and she often allowed Gourdin's ex-girlfriend (Girlfriend)—the girl's mother—to live there too. Upon Gourdin's release from prison, the owner allowed him to live there temporarily also; he slept on a couch in the living room.

¶4      Directly across the street from Victim's residence was a house the neighbors referred to as "Tweakerville," because the

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict." *Wilson v. Sanders*, 2019 UT App 126, n.2, 447 P.3d 1240 (quotation simplified), *cert. denied*, 458 P.3d 747 (Utah 2020).

residents of that house had a reputation for drug use in general and methamphetamine use in particular. While Gourdin was in prison, Girlfriend had become pregnant by a man who lived at Tweakerville; despite that fact, Girlfriend and Gourdin were—at least at first—"trying to work things out." During this time, Girlfriend was "smoking weed and taking pills and doing meth," and she often visited Tweakerville. When Gourdin first got out of prison, he did not participate with Girlfriend in any drug use, but after a while he started using methamphetamine with her. By mid-May 2014, he had progressed to injecting methamphetamine intravenously, and Girlfriend felt that he was becoming "a really scary person"; by this time, their relationship had become "super rocky," and she had begun "questioning having anything to do with him because of how crazy he was" behaving.

¶5     On the morning of May 21, Gourdin—who was at that time unemployed—left the house early to try to drum up some neighborhood yardwork jobs. Gourdin asked one neighbor if he could borrow his lawnmower, but the neighbor refused because Gourdin was acting "bizarre" and made him feel "really, really uneasy." According to this neighbor, Gourdin "was grinding his teeth," was "looking past" him into his house as they spoke, and was "really sweaty." After borrowing a lawnmower from a different neighbor, Gourdin was able to obtain one mowing job, from another neighbor who testified that Gourdin made her, too, feel uneasy because he was so "nervous and fidgety." He did a "very good job" mowing her lawn, though, and she paid him $20.

¶6     Around 10:30 or 11:00 that morning, Gourdin stopped by Victim's house to see if he could mow her lawn.[2] At some point during the interaction, Victim came outside with Gourdin so he could take a look at her backyard grass. Gourdin did not go into the backyard, but just stood at the fence. Due at least in part to

---

2. Details of Gourdin's interactions with Victim that day come from Gourdin's own responses to police interview questions.

difficulty surmounting a language barrier (Victim was a native Spanish speaker), Gourdin and Victim were unable to reach an agreement about a lawnmowing job, and Victim suggested that he "talk to [Son] when he gets home." While standing in the doorway, Gourdin shook Victim's hand, and Victim handed Gourdin "an address book" to write his phone number in. Gourdin took the book, but he "didn't have a number," so he wrote nothing in the book; instead, he set the book down just inside the house on a sewing machine located to the left of the door, and he told Victim he lived just two houses down from her.

¶7 When Gourdin returned home, Girlfriend asked where he had been. Gourdin refused to answer and went "right into the bathroom" to take the first of what would be two unusually long showers that day. When Girlfriend asked why he had showered, he denied that he had and said he was just washing his face.

¶8 Around noon, Gourdin went to a nearby convenience store; the store's clerk observed that he appeared to be "drenched in sweat" and was acting "really paranoid." Gourdin paced up and down the aisles for about thirty minutes and then spent another thirty minutes in the restroom. The clerk got "a really bad vibe" from Gourdin's behavior and "just didn't feel very safe."

¶9 Gourdin continued his search for neighborhood yard jobs that afternoon. One neighbor refused to answer the door when Gourdin knocked because she "didn't feel safe" around him, especially as she noticed him looking at the sides and back of her house. Yet another neighbor, noting how methamphetamine was a problem in the neighborhood, thought Gourdin was "high on meth or something" and felt "really uncomfortable" having Gourdin at his house. Sometime between 2:00 and 4:00 p.m., a neighbor noticed Gourdin "acting weird" because it looked like he was "trying to walk" but "wanted to run"; as she described it, Gourdin "would run for a minute and then . . . stop and look over [his] shoulder." The neighbor's first thought was that Gourdin

must have done something wrong. Not too long after that, Son returned home from work and found his mother dead.

*The Investigation*

¶10    Soon after arriving at Victim's house on the afternoon of May 21, police officers immediately began processing the crime scene, collecting (among other things) the electrical cord that had been wrapped around Victim's neck, Victim's purse, which was missing about $300, and three empty bottles of cleaning agents that were located near the body: Lysol toilet-bowl cleaner, windshield de-icer, and Liquid-Plumr drain cleaner. Officers also collected a fresh-looking "Camel filter" cigarette butt with a red stripe in Victim's backyard; the cigarette butt stood out to them because neither Son nor Victim smoked. Son later found a Walmart receipt, which detectives corroborated with the store's video surveillance, that indicated Victim had been shopping at Walmart—and was therefore still alive—at 1:06 p.m., thus narrowing the time of death to sometime between 1:15 and 3:45 p.m. Initially, police suspected that Son might have had something to do with his mother's death, but he had an ironclad alibi: police could confirm his presence at his workplace all day. Police then began speaking with various neighbors, an exercise that led them to start investigating Gourdin.

¶11    The police spoke with Gourdin three times during their investigation. The first encounter was on the evening of the murder, when police informally questioned Gourdin outside his house as part of their initial neighborhood canvass. During this discussion, Gourdin said he had visited Victim's house that morning to ask for work but had been unable to effectively communicate with her due to a language barrier, so he "just left."

¶12    The second encounter occurred the following day—on May 22—when Gourdin voluntarily went to the police station to make a formal statement. By that point, police considered Gourdin a "person of interest" in their investigation. During this

encounter, Gourdin provided some additional details about his May 21 visit to Victim's house: he had been at Victim's door and had "[p]ossibly" stepped "just inside the doorway," but he had made no physical contact with her. During this interview, Gourdin also told officers that, at some point after police began questioning people in the neighborhood, Girlfriend made statements to him openly wondering about Gourdin being "gone" at times on the day of the murder, statements Gourdin interpreted as Girlfriend indirectly accusing him of being involved. Gourdin told officers that he responded to Girlfriend's statements by denying any involvement in Victim's murder, telling Girlfriend that he had "nothing to hide." Gourdin also told officers that he had recently been in "altercations" with the residents of Tweakerville "because [his] kid was over there and they all smoke dope." Officers recorded this entire interview, and it was eventually played for the jury at trial in video format.

¶13 The third encounter occurred five days later in the county jail, where Gourdin was in custody for allegedly assaulting one of the residents of Tweakerville in an apparently unrelated incident. By this time, Gourdin was "a lot higher on the radar" for police "as far as a suspect in this case." Officers also recorded this interview, and it was later played for the jury during trial as an audio recording.

¶14 During this third interview, Gourdin told officers that he had not only been just inside the door of Victim's residence on May 21, but he had also shaken her hand and touched her address book. Officers made a considerable effort, during this interview, to elicit a confession from Gourdin, even going so far as to lie to him about the state of the DNA evidence. In particular, officers told Gourdin—falsely—that the "evidence says you're our guy," that the "chemicals don't wash off" the DNA, and that "[y]our DNA is there and on her." The detectives continued to press Gourdin, telling him that the killer "tried to cover their tracks" but "the science is going to bring that out" and "it's pointing at you."

Officers also suggested that Gourdin might have committed the murder while high on drugs, and therefore he might not remember it, telling him that "you seem like a nice guy" so "[t]his has got to be the drugs." Gourdin admitted to officers that he had "a problem with drugs" and that family members had described him as "violent." Officers also took Gourdin to task for what they perceived to be his shifting story of how much contact he had with Victim on the day of her murder, noting that "every time we ask you about touching [Victim] and where you were at [in Victim's house], it changes." Toward the end of the interview, Gourdin asked the officers, "[W]hat do you guys all got on me . . . to say that I did this?" Officers responded by offering their view that "that's not what somebody says . . . [who] is innocent." But despite the considerable effort by the officers, Gourdin did not confess. He consistently denied any involvement in Victim's murder, telling officers that he might be a "criminal" who had "done a lot of messed-up things," but saying, "I'm not that."

¶15   Officers also actively pursued forensic evidence. They searched for prints at the scene but were unable to find any that were usable. They also enlisted the assistance of the State's crime lab (the crime lab) and, later, Sorenson Forensics (Sorenson), a private lab, to test a number of items for DNA, including the following: the electrical cord; Victim's wallet and purse; the coffee table in Victim's living room; the cigarette butt found in Victim's backyard; Victim's fingernail scrapings; one of the chemical bottlecaps; and parts of both Victim's and Gourdin's clothing. The particulars of these tests are discussed more fully below but, in summary, some of the tests definitively excluded Gourdin as a possible match, and the rest of them were "inconclusive." None of the DNA tests pointed conclusively to Gourdin.

¶16   More than a year after the murder, in or about September 2015, no charges had been filed against anyone in connection with Victim's death. At that point, officers made the decision to conduct a coordinated "inmate interview blitz" of Gourdin's

current and former cellmates. In this way, officers came into contact with one of Gourdin's former cellmates (Informant 1), who claimed to have information about Victim's murder and offered to testify against Gourdin in exchange for a transfer to a prison closer to his ailing mother. Informant 1 explained that he was a former member of the "Latin Kings" gang and had been discussing the requirements for joining the gang with Gourdin when they were cellmates. According to Informant 1, he told Gourdin that a person had to commit murder—or, as he put it, to "catch a body"—to be able to join the Latin Kings, and Gourdin then asked if it would count if he "already did something bad to that extent." Informant 1 also stated that Gourdin had expressed concern that he might have left something behind at the murder scene, "like a cigarette butt or something that connected him to it." Informant 1 was, however, careful to specify that Gourdin never expressly told him he had committed murder, although he did get "the impression" that Gourdin "was saying he had killed somebody, even though he didn't say it directly."

¶17    Finally, in August 2018—more than four years after Victim was murdered—the State filed an aggravated murder charge against Gourdin. According to the probable cause statement, the State's case relied largely on testimony from Girlfriend and the neighbors regarding Gourdin's dodgy behavior on the day of the murder, the fact that Gourdin admitted to being at Victim's house that day, and the testimony from Informant 1.

¶18    In January 2019, as the case was in its early stages, officers received a letter from a second informant (Informant 2), who had been cellmates with Gourdin in 2018. He told authorities that Gourdin had shown him a "187" tattoo on his chest. That number is apparently prison slang for murder—a term derived from the section of the California Penal Code dealing with murder—so Informant 2 asked Gourdin, "Do you have a body?", and Gourdin responded affirmatively. According to Informant 2, Gourdin went on to explain that he had murdered "some Paisa"—which

Informant 2 explained was a "derogatory term" for "Mexicans" that is sometimes used in prison—when he had broken into her house to steal money and unexpectedly found her there. Informant 2 said Gourdin told him additional details of the crime: that he had been casing the neighborhood to get money to buy drugs; that even though he wore gardening gloves he still worried about his DNA being found at the crime scene because he had been sweating so much; and that he poured "bleach and Drano" on the victim and planned to come back and set everything on fire, but was ultimately unable to do so before the police arrived.[3] Informant 2 asked corrections officials for "special attention" during his parole hearing in consideration for his cooperation with Gourdin's case.

### Pretrial Proceedings

¶19 After the State filed the aggravated murder charge in August 2018, the case moved along toward trial. Early in the case, the State provided Gourdin's counsel (Trial Counsel)[4] with copies of the various DNA reports—but not the technicians' underlying notes and files—generated by the laboratories that ran the DNA tests. In February 2019, the court, acting as magistrate, held a two-day preliminary hearing. Among other evidence, the State presented the DNA reports and argued that, even though some of

---

3. Informant 2 admitted that Gourdin shared some of his discovery papers with him, a fact that—as Gourdin's counsel pointed out at trial—makes it possible for Informant 2 to have learned some of the details of the crime from those documents rather than from Gourdin directly. But as the State pointed out at trial, Informant 2 also knew certain details about the crime that were not in the discovery documents Gourdin shared with him.

4. During the case, including at trial, Gourdin was represented by two defense attorneys. We refer to them collectively as Trial Counsel, but we also refer to them individually as needed.

the tests ruled out Gourdin, others were inconclusive and allowed for the possibility that Gourdin might have been involved, especially considering the fact that the killer tried to eradicate any trace of DNA by using chemicals and likely wearing gloves. At the conclusion of the preliminary hearing, the court took the matter under advisement, and it later issued a written ruling binding Gourdin over for trial on the aggravated murder charge.

¶20　At a hearing in March 2019, the court scheduled a trial to occur in September 2019. At that hearing, the court asked counsel for each side if they planned on using expert witnesses so it could schedule disclosure deadlines. Trial Counsel responded that they planned to make a decision about whether to hire defense experts after receiving the State's expert witness disclosures, and they indicated that if they received the State's disclosures some two months prior to trial, that would be "enough time" to contact and hire defense experts if necessary.

¶21　A month later, at a pretrial conference, the court again asked Trial Counsel whether they planned to use expert witnesses at trial. Trial Counsel acknowledged that they "might have to get a DNA expert" but that they were "waiting to see what the State's DNA testimony would be." The court then set July 28 as the deadline for the State's expert disclosures, and August 28 as the deadline for any defense expert disclosures. In late July, before the deadline, the State filed its disclosures, and indicated that it would call two separate DNA experts, one from the crime lab and one from Sorenson. At a hearing on August 28, Trial Counsel told the court that "at this point, [they were] leaning towards not bringing experts in to testify to refute" the State's DNA evidence, and that they did not "anticipate that changing."

¶22　Trial Counsel later explained that the "decision not to consult a defense DNA expert was based in large part [on] Gourdin's instruction not to." Trial Counsel made this decision after reviewing the DNA reports produced by the State and

concluding that—in light of the fact that none of the DNA evidence pointed conclusively toward Gourdin—"the risk of discovering inculpatory evidence" with further DNA analysis "was worse than the inconclusive results [they] already had."[5] Trial Counsel's concerns were based, in part, on their experience where, in certain instances, additional investigations had ended up harming their client's defense. But Trial Counsel made this decision after reviewing only the DNA reports submitted by the State's experts; Trial Counsel did not interview or question the authors of the State's DNA reports, did not ask the State to produce the data or laboratory notes that supported the DNA reports, and did not consult an expert of their own.

¶23   Trial was eventually postponed from September to December 2019. Just a few weeks before trial, in November 2019, two notable events occurred. First, the State produced three new DNA reports that, for the first time, demonstrated that one of the "unknown" male profiles on some of the DNA tests—including the one on the cord used to strangle Victim—matched an evidence technician (Evidence Technician) who had gathered evidence at the crime scene. This new evidence demonstrated that Evidence Technician—who apparently had a cold and had been coughing on the day he was at the crime scene—had contaminated the scene with his own DNA. It also eliminated the possibility that the previously unknown "male profile" could belong to a different killer. This new revelation would likely have entitled Gourdin to a postponement of the trial had he wanted one, but Gourdin himself elected to proceed with the trial as scheduled.

¶24   Second, Trial Counsel filed a motion in limine seeking to limit the State's expert testimony regarding the DNA test results. In the motion, Trial Counsel acknowledged that any DNA

---

5. The statements in this paragraph come from sworn testimony provided by Trial Counsel at the rule 23B hearing, as described more fully later. *See infra* ¶¶ 47–49; *see also* Utah R. App. P. 23B(e).

evidence that purported to conclusively establish someone's presence at the scene, or that purported to conclusively eliminate the possibility of someone's presence at the scene, was admissible evidence. But they argued that the "inconclusive" DNA evidence was, in this case, inadmissible, because that evidence did not come accompanied by any "ratios as to the likelihood the DNA could be" Gourdin's. Trial Counsel asserted that this "inconclusive" evidence would give rise to the possibility that the jury could give it "undue weight and speculate" that Gourdin might have been at the scene. Accordingly, Trial Counsel argued that the State's DNA experts should be limited to discussing only those portions of the DNA evidence that were conclusive, one way or the other.

¶25 In response, the State argued that, for two reasons, it needed to be able to introduce all the DNA evidence. First, the State asserted that even the "inconclusive" DNA evidence was relevant "for the purpose of showing the completeness" of its investigation. And second, the State argued that "it is certainly probative for the jury to know that there was other human DNA on the power cord beside[s] the major profiles that exclude" Gourdin, and that excluding the "inconclusive" DNA evidence would create "an unfair advantage for [Gourdin] by presenting only the DNA results favorable to him in a way that would mislead the jury about the full truth of the DNA evidence."

¶26 After hearing oral argument on the motion, the court offered its view that Gourdin's "concern that the jury may infer the inconclusive test results indicate the DNA belongs to [Gourdin] is well-taken," and that if the State were to argue to the jury that "the DNA evidence does not exclude" Gourdin, that would be "an error" and would be "wrong." But the court nevertheless denied Gourdin's motion, concluding that the "inconclusive" DNA evidence was "relevant to show that" the State conducted "a complete investigation of the scene," as well as to provide a complete and accurate "summary of the evidence."

However, the court "caution[ed] the State to ensure [that] its expert provides neutral testimony on this subject so as not to encourage the jury to draw an improper inference from the evidence," and instructed that "[t]he jury is not to use the test results as direct evidence of [Gourdin's] guilt." And the court indicated that, if the State crossed the line in this regard, the court would "have a jury instruction ready to give" that "indicates that the DNA evidence is inconclusive and bears no relevance to [Gourdin's] guilt."

*The Trial*

¶27 A ten-day jury trial was held in December 2019. In support of its case-in-chief, the State presented testimony from numerous fact witnesses, including Son, Girlfriend, and both informants, as well as some of Son's co-workers who corroborated Son's alibi. Girlfriend testified that as soon as she found out about the murder, she "instantly ran into the house" and asked Gourdin, "Did you murder her?" She testified that he replied, "Don't accuse me of that." According to Girlfriend, Gourdin acted "[s]uper paranoid" when officers arrived at Victim's house; he "couldn't sit still" and paced back and forth, "looking out the windows," which Girlfriend found odd because "usually he's the type of person that if he sees something going on, he's going to go outside and see what's up," yet he "refused to go outside at all." In addition, nine neighbors and the convenience store clerk testified about their interactions with Gourdin on the day of the murder.

¶28 Various police officers also testified about law enforcement's investigation of the crime. The officer who questioned Gourdin on the evening of the murder testified how Gourdin "seemed off" and "wouldn't make eye contact," and how he "was grinding his teeth" and "clenching his jaw every time [police] tried to talk to him." Another officer recalled searching the yard of the house where Gourdin was staying: he testified about finding charred clothing in a backyard fire pit, and

about finding four Camel cigarette butts—some with red stripes and some with blue stripes—at various places in the yard.

¶29    During some of the officers' testimony, the State—without objection by Trial Counsel—played for the jury the recordings of Gourdin's two formal police interviews. The one that took place at the police station the day after the murder was presented to the jury as a video; the State had "edited out" certain "portions of the interview that were inadmissible for one reason or another." The one that took place at the jail a week after the murder was played for the jury as an audio recording. After the interviews were played, the interviewing detectives acknowledged that they lied to Gourdin about the state of the DNA evidence as a tactic to elicit a confession. One of them also described how Gourdin rose higher up their list of suspects after each interview, particularly after the last one when Gourdin "put himself further into [Victim's] home and worried about [his] fingerprints on an address book that was inside of her home."

¶30    The State also took quite a bit of trial time to present expert testimony about the DNA testing results conducted at both the crime lab and at Sorenson. As a general matter, the experts testified that DNA tests can sometimes reveal both a "major profile" and a "minor component," and they explained that, when multiple people are contributing to a DNA sample, there may be instances when it is clear that one person has contributed more DNA than the others; that contributor is then identified as the "discernible major profile." If there are no "discernible major and minor" profiles on a sample, it is considered a complex mixture, and when the DNA in a sample is too complex—when the scientists "just can't tell who's in there and who's not"—then no meaningful comparisons can be made from the sample.

¶31    The senior forensic scientist from the crime lab testified that "there are no DNA results that match [Gourdin]" from items tested at the crime lab. The expert from Sorenson offered similar

testimony. But the State presented the DNA evidence in much more detail, beyond those basic conclusions. In particular, the State presented DNA test results with regard to a number of items, as follows:

- <u>Electrical cord</u>: The electrical cord used to strangle Victim was cut into several sections for analysis. Initial testing, conducted in 2014, found "a mixture of DNA profiles from a minimum of two contributors," at least one of which was male, and one of whom was likely Victim. Son was excluded as a possible contributor. Later testing excluded Gourdin as the source for the "major" DNA profile and confirmed that the "major" profile belonged to Evidence Technician. But the State's experts testified that "the minor portion of this profile [was] inconclusive," at least with regard to one segment of the cord—the plug end—and that no conclusions could be drawn from it.

- <u>Victim's purse</u>: No male DNA was found on Victim's purse.

- <u>Coffee table</u>: Swabs from the coffee table contained "a mixture from more than two individuals" but "did not exhibit a discernible major or minor profile." Accordingly, because of the "complexity of the mixture," the experts could "not make any meaningful comparisons" and couldn't "tell who's in there and who's not."

- <u>Wallet</u>: Testing on Victim's wallet revealed "a mixture of DNA from more than two individuals," including a "discernible major profile and minor components." The major profile matched Victim and excluded both Son

and Gourdin, but the minor profile was inconclusive, and the experts were unable to "make any conclusions" about it.

- <u>Cigarette butt</u>: The red-striped Camel cigarette butt found in Victim's backyard was tested for DNA.[6] Specifically, the experts tested the "filter paper that's over the filter" because "that's the part that will be in [the] mouth" of the person smoking the cigarette, and saliva often gives "a better DNA profile" than things people merely touch with their fingers. Testing revealed at least two profiles—a major and a minor. The minor profile was too "low" to be "able to be used for comparison purposes," and initial testing excluded all the residents of Tweakerville from the major profile. In what the State later called "a police oversight," the crime lab—in its initial testing in 2014—was not asked to compare the cigarette butt against Son's or Gourdin's DNA profiles. And when Sorenson was later asked to run those comparisons,[7] it declined to do so because it was not "comfortable making a comparison based on the complexity of the mixture." Thus, no evidence was presented to the jury about whether the DNA on the cigarette butt located in Victim's yard matched Gourdin; other individuals were excluded, but Gourdin

---

6. Multiple cigarette butts were collected by investigators, including some that were found in the backyard of the house where Gourdin had been living, *see supra* ¶¶ 10, 28, but only the butt found in Victim's backyard was submitted for DNA analysis.

7. The crime lab later discontinued certain types of DNA testing, so the cigarette butt was sent to Sorenson.

was never either included or excluded because the crime lab had not been asked to run the relevant tests and because Sorenson declined to do so.

- <u>Gourdin's clothing</u>: Victim was excluded as a possible contributor to the DNA found on Gourdin's jacket. Testing on Gourdin's t-shirt was "too complex" to lead to any conclusions. And none of the chemicals used at the crime scene were found on any of Gourdin's clothing.

- <u>Victim's clothing</u>: Gourdin was excluded as a possible contributor to the major profile found on Victim's clothing.

- <u>Victim's fingernail scrapings</u>: No male DNA was detected on Victim's fingernail scrapings.

- <u>The bottle cap from the de-icing chemical bottle</u>: The experts concluded that there was insufficient DNA on the bottle cap to obtain a useful profile.

¶32 In his defense, Gourdin presented three witnesses, all of whom presented testimony aimed at undermining the credibility of the two informants. To that end, the defense called an expert witness regarding prison gangs, but it did not call any witness—expert or otherwise—to discuss the State's DNA evidence.

¶33 During its opening statement, the State had discussed the DNA evidence—inconclusive though it was—in some detail, telling the jury that "inconclusive forensic evidence is still evidence." The State acknowledged that "the DNA evidence either does not identify [Gourdin] or is inconclusive." But it also pointed out that the DNA evidence on the cigarette butt "excluded all of the" residents of Tweakerville but that the data

was "insufficient to make any meaningful comparisons" to Gourdin's DNA, and that Gourdin had acknowledged, in one of the police interviews, that it was "possibly his cigarette butt" that was found in Victim's yard. The State made a similar argument regarding the electrical cord, noting that DNA tests excluded Gourdin and Son as contributors to the major profile, but that the tests showed "traces of at least four other people on the cord" and "there was not enough" DNA for the experts "to make any meaningful comparisons" there. The State also pointed out that the killer had used bleach and other chemicals to try to destroy any DNA evidence, which was a possible reason why Gourdin's DNA did not show up on the items tested.

¶34 During trial, the State ended up spending a lot of time discussing the cigarette butt found in Victim's yard. In total, the State brought up cigarettes generally or the cigarette butt specifically during opening and closing arguments and with twelve different witnesses; issues related to cigarette-butt evidence are discussed on over ninety-five different pages of the trial transcript. In fact, during closing argument, the State apologized to the jury for spending so much trial time on DNA evidence that it described as ultimately "inconclusive," and frankly acknowledged to the jury that "the answer to this case is not in the forensic evidence." The State admitted that there had been "a lot of talk about cigarettes and about this cigarette in particular, probably more than it deserved, but it's just one of those things that kind of ended up happening that way." The State also specifically acknowledged the "police oversight" that resulted in the crime lab's apparent failure to test the cigarette butt for Gourdin's DNA. Yet the State argued that the "circumstances do suggest that" the cigarette butt was indeed Gourdin's, pointing out that the butt was the same brand as the cigarettes Gourdin was known to smoke and that other red-striped Camels were found in the backyard of Gourdin's house. The State even specifically theorized that Gourdin had spent some of the $20 he earned mowing lawns on the morning of the murder on a pack of

red-striped Camels purchased at the convenience store, and that he and others smoked that pack on May 21 before switching to blue-striped Camels on May 22. The State asserted that "the evidence is very suggestive of the fact that Mr. Gourdin did drop that red-striped Camel . . . cigarette in [Victim's] yard."

¶35    The State also emphasized the fact that the killer had used bleach and other chemicals to destroy any DNA evidence at the murder scene, and pointed out that not even Son's DNA was conclusively found on the electrical cord despite the fact that Son admittedly touched the cord after finding his mother's body. From this, the State argued that "the fact that [DNA testing] can't put Mr. Gourdin on the [electrical] cord doesn't mean anything except that the chemicals did their job and/or he had gloves on."

¶36    Later, during the State's rebuttal closing argument, it again acknowledged that the scientific evidence in the case was "limited" and did not directly implicate Gourdin. But it asserted that "[n]either does the forensic evidence exonerate" Gourdin, and it argued that "the lack of forensic evidence was caused by" Gourdin. It reiterated that the evidence was "inconclusive" and that it "does not prove that Mr. Gourdin did not do it, just like it doesn't prove that he did do it." Later, it again emphasized what it believed was "an important point," namely, that the forensic evidence "doesn't let [Gourdin] off the hook."

¶37    After deliberation, the jury found Gourdin guilty of aggravated murder, and the trial court later sentenced him to life in prison without parole.

### *Rule 23B Remand Hearing*

¶38    After his sentence was imposed, Gourdin filed an appeal of his conviction, asserting that Trial Counsel had rendered ineffective assistance. In connection with his appeal, Gourdin filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, seeking to supplement the record to include evidence

that he believed would support one of his claims of ineffective assistance: that Trial Counsel was ineffective for not obtaining the data underlying the State's DNA reports and for not at least consulting with (and potentially calling at trial) a DNA expert of their own. We granted that motion and remanded the case to the trial court to make findings on the issues raised.

¶39    On remand, the court held an evidentiary hearing. At that hearing, the court heard testimony from several witnesses, including both of Gourdin's trial attorneys, the lead investigating detective (Lead Detective), two forensic scientists from the crime lab (Scientist 1 and Scientist 2), and a forensic scientist retained by Gourdin's appellate attorneys (Expert).

¶40    During the hearing, Gourdin's trial attorneys testified about their motives for taking certain actions and about their trial strategy generally. In addition, various witnesses discussed two broad categories of evidence that was not introduced at trial: (1) documents regarding the crime lab's testing on the cigarette butt that were in existence at the time of trial but not known to Trial Counsel, and (2) evidence—including probabilistic genotyping evidence[8]—that could have been generated had Trial Counsel hired a DNA expert. The first category included, among other things, two documents that are especially relevant to our analysis: (a) a handwritten note created by Scientist 1 indicating that he had conducted—against the crime lab's protocol—an informal analysis of whether Gourdin's DNA matched the DNA found on

---

8.    "Probabilistic genotyping refers to the use of biological modeling, statistical theory, computer algorithms, and probability distributions to calculate likelihood ratios . . . ." U.S. Dep't of Justice, *Uniform Language for Testimony and Reports for Forensic Autosomal DNA Examinations Using Probabilistic Genotyping Systems* 2 n.2 (2022), https://www.justice.gov/olp/page/file/1095961/download [https://perma.cc/2L6M-9CWE].

the cigarette butt found in Victim's yard, which analysis indicated that Gourdin's DNA was not on that cigarette butt; and (b) a "quantifiler duo worksheet" (the Worksheet) generated by the crime lab, which shows that the primary contributor of DNA on the cigarette butt was female. Both documents were discovered when Gourdin's appellate counsel filed a GRAMA request.[9] We summarize this evidence in the following paragraphs.

¶41 **Cigarette Butt Evidence**. Lead Detective testified that, at some point before trial, he discovered that Gourdin's DNA profile had not been included in the crime lab's analysis of "multiple items," including the cigarette butt, so he sent DNA profiles of both Gourdin and Son to Scientist 1 for analysis. Lead Detective could not recall, however, whether Scientist 1 responded or whether Gourdin's profile was compared to the cigarette butt. He testified that, at the time, the cigarette butt did not seem like especially valuable evidence because "frankly, an animal, a bird could have picked that up, could have moved that from anywhere," so to him, at least at the time, "that cigarette [butt] didn't hold a lot of value as far as evidence."

¶42 Scientist 1 testified that, between 2014 to 2019, he regularly supervised the other analysts at the crime lab and interacted with the agencies that submitted evidence to the lab. Scientist 1 was not initially assigned to Gourdin's case, but he was "pulled into the case" later when Lead Detective asked to be kept abreast of the crime lab's progress. At some point, Lead Detective realized that Gourdin's profile had not been tested against those from the cigarette butt, and he asked the crime lab to find out if Gourdin's and Son's DNA "would show up on the cigarette." Scientist 1—in

---

9. "GRAMA" is shorthand for Utah's Government Records Access and Management Act, a statute that allows citizens, under some circumstances, to obtain "easy and reasonable access to unrestricted" government records and documents. *See* Utah Code §§ 63G-2-102, -301.

an action that is apparently against crime lab policy—conducted an informal analysis on that point, and he jotted down the results of that analysis in an undated, handwritten note comparing the DNA profile found on the cigarette butt to the DNA profiles of Gourdin and Son. Scientist 1 stated that the fact he didn't date the note struck him as "odd" and indicates that his analysis was more like a "case consultee looking through things and making probably self notes of what [he] was seeing, and didn't intend for it to be in the case file." During his testimony, Scientist 1 stated that his analysis had not been "complete" and that the crime lab would have needed to "run these reference samples and make a complete comparison" before any "official report could be made." But according to Scientist 1's informal analysis, Gourdin was excluded from the cigarette butt's major profile.

¶43     At the hearing, the court also heard evidence about the Worksheet, which is a spreadsheet created by the crime lab containing notations depicting the results of the "process of estimating how much DNA" was found on the cigarette butt, and specifically "how much male . . . DNA there is." As Expert explained, the Worksheet reveals that "there is far more female DNA" on the cigarette butt "than male DNA," and that therefore the major profile found there has to be from a female. He testified that the crime lab's report on the cigarette butt did not indicate that the major contributor to it was female, and he stated that the only way to have known that was from the data found in the Worksheet. Scientist 2 agreed with Expert that the Worksheet shows that the primary source of DNA on the cigarette is "most likely" female. Scientist 2 also testified that, had the document been presented at trial,[10] one of the State's experts "would have

---

10. Scientist 2—who testified at the original trial—confirmed that she had not seen the Worksheet before she testified because it was created by an analyst (Analyst) who left the crime lab before trial and who "was not available at the time" to testify. Instead,

(continued…)

been able to identify that the primary source of DNA" on the cigarette was "most likely a female."

¶44    From his review of Scientist 1's notes and the Worksheet, Expert arrived at certain conclusions. Most notably, he concluded that Gourdin could be excluded as not only the major contributor to the cigarette butt but also as a minor contributor. And Expert opined that he could not have made such a determination "without access to . . . the underlying data or the notes" associated with the crime lab's reports. He testified that, had he been retained as a defense expert prior to trial, he would have asked for and received Scientist 1's notes and the Worksheet and would have been able to inform Trial Counsel that Gourdin's DNA was not on the cigarette butt. Finally, Expert testified that the relevant documents in the crime lab's underlying files—Scientist 1's notes and the Worksheet—would not have been useful to a lay reader, or even to an attorney, without consulting a DNA expert. Indeed, he stated that he has "never met an attorney who actually knows enough about the intricacies of [DNA] testing to be able to simply read a report [like the Worksheet] and know sort of what code is imbedded in all of the words."

¶45    **Probabilistic Genotyping Evidence**. In addition to discussing the additional evidence discovered in the crime lab's files, Expert also provided testimony about additional testing he could have done had he been hired by Trial Counsel before trial. Expert described how he could have done his own "probabilistic genotyping" of the DNA samples, a relatively new innovation that allows him to analyze at least some of the complex samples

---

Scientist 2 offered testimony at trial regarding Analyst's ultimate report; she "was allowed to testify to anything that [Analyst] had written in his report," including "his conclusions," but she was "not able to testify to any of his notes because that would be the work he [had] actually done himself." The Worksheet was considered part of Analyst's notes.

that Sorenson and the crime lab declined to interpret and reported as inconclusive. Expert took issue with the notion that "inconclusive" necessarily means "exculpatory," stating that "inconclusive" means "we really don't know anything about the DNA" and that "[i]t's as if the test was not done." Expert testified that, as part of his engagement with Gourdin's appellate attorneys, he had conducted probabilistic genotype testing on samples taken from Victim's wallet, the coffee table, and the electrical cord—items for which some of the profiles had been presented as inconclusive at trial—and that his testing showed that the data were better explained by Gourdin's absence than by his presence. For instance, he calculated that, accounting for the probability of Evidence Technician[11] and Victim as contributors, it "is 9 million times more likely" that a random person, rather than Gourdin, is the third contributor to the electrical cord.

¶46   Testimony indicated, however, that the crime lab was not set up to conduct probabilistic genotype testing in 2018 or 2019—the relevant time period here—and, in fact, was unable to perform such tests until early 2023. Sorenson began performing probabilistic genotype testing in January or February 2019, but Sorenson's chief executive officer testified that he was not aware of any defense attorneys in Utah asking Sorenson to do probabilistic genotype testing in 2019.

¶47   **Trial Counsel's Strategy**. Gourdin's two trial attorneys also testified about their strategy, particularly regarding their decision not to request the underlying files and data from the State's DNA experts or to retain a DNA expert of their own. They "did not automatically rule out consulting a defense DNA expert," but retaining such an expert did not seem critical to them because the State's DNA testing yielded "inconclusive results that

---

11. As noted earlier, *see supra* ¶ 23, Evidence Technician had a cold when he collected evidence at the crime scene, and his DNA was discovered on the electrical cord before trial.

[didn't] implicate" Gourdin and, in their view, indicated "a poor investigation." They saw the DNA evidence as a weakness for the State because "the State bears the burden" to prove guilt "beyond a reasonable doubt," and they theorized that the lack of any "connection between the DNA evidence and [Gourdin]" would form the "basis for reasonable doubt." Moreover, both attorneys described experiences in past cases where additional investigation ended up backfiring by unearthing evidence unfavorable to their clients.

¶48    The attorneys explained that they made their decision regarding DNA evidence in consultation with Gourdin. When they told Gourdin that the State could not conclusively locate his DNA on any item at the crime scene, Gourdin stated that he did not want them to investigate the DNA evidence further. Trial Counsel made it clear to Gourdin that only he could know "to what extent there might be a risk of finding incriminating DNA evidence," so when he "instructed [them] not to pursue that," they were concerned about what might be uncovered. Gourdin apparently felt confident he was going to be acquitted, and he told Trial Counsel that his "principal priority" was to be done with the trial. Even after Evidence Technician's DNA was found on the electrical cord in November 2019, Gourdin instructed Trial Counsel not to request a continuance.

¶49    Finally, because Trial Counsel decided not to hire a DNA expert, they did not see a reason to request the underlying DNA notes or data from Sorenson or the crime lab. Trial Counsel "believed if there was something else in some other file that was exculpatory, that the prosecution would provide that to" the defense. For example, Trial Counsel explained that, when the State learned that one of the unidentified profiles belonged to Evidence Technician, it "provided that to" the defense, confirming to Trial Counsel that "if [the State] had something exculpatory they would give it to" Trial Counsel.

¶50    In sum, testimony at the rule 23B hearing centered on (1) already-existing evidence—Scientist 1's handwritten note and the Worksheet—about the cigarette butt that Trial Counsel could have accessed if they had asked for the State's witnesses' underlying notes and data, (2) new probabilistic genotyping evidence that Trial Counsel could have presented at trial had they retained a DNA expert, and (3) Trial Counsel's strategy for not using either approach.

*Findings on Remand*

¶51    After the hearing concluded, the court took the matter under advisement and later issued almost forty pages of findings, including the following findings about the cigarette butt, Scientist 1's handwritten note, and the Worksheet:

- the crime lab "analyzed the cigarette butt and concluded that it contained a discernible major and minor profile," but in "an apparent oversight, the crime lab did not compare either profile to Gourdin";

- in 2016, Lead Detective emailed to Scientist 1 the DNA profiles of Gourdin and Son, asking Scientist 1 to compare those profiles to the DNA found on the cigarette butt and to notify him "when the report [was] available to review";

- at some point, possibly—but not necessarily—in response to Lead Detective's email, Scientist 1 compared the DNA profile from the cigarette butt to Gourdin and Son in a handwritten note that Scientist 1 does not recall creating;

- Trial Counsel was aware of this oversight and made "a deliberate strategic choice not to alert

the State to the oversight" or to independently test the cigarette butt;

- when the State later discovered its failure to compare the DNA profile on the cigarette butt to Gourdin and asked Sorenson to conduct the comparison, Sorenson refused, stating that the DNA sample "was too complex for a reliable comparison";

- the Worksheet indicated that the major profile found on the cigarette butt belongs to a female, and that, outside of the Worksheet, "no one identified that the primary source of DNA on the cigarette was female";

- "an attorney would not have known that the major contributor to the cigarette was a female" because the only indication of that came from the Worksheet, which was not decipherable to attorneys absent expert consultation;

- if Scientist 2 had seen the Worksheet at trial, she would have been able to testify that "the primary source of DNA on the cigarette was 'most likely' female"; and

- the crime lab did not include the conclusions from the Worksheet in its formal report because it did not "type for female DNA."

¶52    In addition, the court found that, although the labs in this case could identify DNA types in the complex mixtures, they "correctly" declined to interpret them because they did not have the capacity between 2014 and 2016 to perform probabilistic genotype testing. However, the court found that, had Trial Counsel retained Expert in 2018 or 2019, Expert would have been

able to use probabilistic genotyping to analyze those complex DNA mixtures, and would have been able to testify that the DNA profiles found on the items at the crime scene are "better explained by the absence of [Gourdin] than his presence."

¶53   And regarding Trial Counsel's strategy and motives, the court observed that Trial Counsel "did not consult with a DNA expert" or request the underlying DNA notes or data. As for the reasons why, the court found that Trial Counsel believed that eliciting testimony from the State's experts was more effective with juries than using their own experts, who are often viewed as "hired guns," and that Gourdin, during conversations with Trial Counsel, had given them some reason to believe "there was a risk that additional DNA investigations would not be favorable." And at least as of November 2019, Trial Counsel opted not to ask for a continuance because Gourdin didn't want one.

ISSUE AND STANDARD OF REVIEW

¶54   Gourdin asserts that he is entitled to a new trial because Trial Counsel rendered constitutionally ineffective assistance.[12] "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and

_____

12. Gourdin also raised a *Brady* claim for the first time in his supplemental appellate brief after the rule 23B hearing, claiming that "the State violated [Gourdin's] constitutional right to due process by failing to disclose exculpatory evidence possessed by the [crime lab]." *See Carter v. State*, 2019 UT 12, ¶ 48, 439 P.3d 616 ("The United States Supreme Court has held that 'the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963))). Because we reverse Gourdin's conviction on one of his ineffective assistance of counsel claims, we need not reach this issue.

we must decide whether the defendant was deprived of effective assistance of counsel as a matter of law." *State v. Reid*, 2018 UT App 146, ¶ 17, 427 P.3d 1261 (quotation simplified), *cert. denied*, 432 P.3d 1225 (Utah 2018). This standard does not change merely because the case was remanded for supplementation of the record pursuant to rule 23B: when a "trial court has held a rule 23B hearing and made specific findings relevant to an ineffective assistance of counsel claim, we defer to" those findings, "apply the appropriate legal principles to the facts, and decide, for the first time on appeal, whether the defendant received ineffective assistance of counsel." *State v. Forbush*, 2024 UT App 11, ¶ 72, 544 P.3d 1 (quotation simplified), *petition for cert. filed*, Feb. 26, 2024 (No. 20240205).

ANALYSIS

¶55 To succeed on a claim of ineffective assistance of counsel, Gourdin must make a two-part showing: (1) that Trial Counsel's performance was deficient in that it "fell below an objective standard of reasonableness," and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871.

¶56 The first part of the test requires Gourdin to show that Trial Counsel's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took were motivated by trial strategy. *See id.* ¶ 35 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic

reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *Ray*, 2020 UT 12, ¶ 34.

¶57 The second part of the test requires Gourdin to show that he was prejudiced by Trial Counsel's deficient performance. "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150, *cert. denied*, 481 P.3d 1043 (Utah 2021). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing prejudice, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (quotation simplified).

¶58 In this case, Gourdin asserts that Trial Counsel rendered ineffective assistance in two specific respects. First, Gourdin takes issue with Trial Counsel's decision not to object to the State's effort to play for the jury the recordings of his two police interviews. Second, he challenges some of Trial Counsel's DNA-related decisions, in particular the decision not to request the data underlying the State's DNA reports and the decision not to consult with, or call as a witness, a defense DNA expert. We address these two issues in turn. In sum, we reject Gourdin's arguments regarding the police interviews, but we find merit in some of Gourdin's arguments regarding the DNA evidence.

## I. The Police Interviews

¶59 Gourdin's first claim is that Trial Counsel rendered ineffective assistance by not objecting to the State's request to play

for the jury the recordings of his two police interviews.[13] As noted, the first interview—the one that took place at the police station the day after the murder—was presented to the jury as a video, from which the State had "edited out" certain "portions of the interview that were inadmissible for one reason or another." The second interview—the one that took place at the jail a week after the murder—was played for the jury as an audio recording.

¶60 Because a "failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Gourdin's] claims under either prong." *State v. Popp*, 2019 UT App 173, ¶ 25, 453 P.3d 657 (quotation simplified), *cert. denied*, 485 P.3d 943 (Utah 2021). With regard to this first argument, Gourdin falls short of proving deficient performance because there exists a clear strategic reason why a reasonable attorney might have chosen to forgo any objection to the State's request to admit the interview recordings: admission of those

---

13. Gourdin also asserts that the court committed plain error by not sua sponte acting to bar the jury from hearing certain portions of the interview recordings. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the [trial] court; and (iii) the error is harmful." *State v. Hedgcock*, 2019 UT App 93, ¶ 11, 443 P.3d 1288 (quotation simplified). "In our adversarial system, [trial] courts should be circumspect about interfering in the parties' strategic decision-making regarding the admission of evidence," and a court "is not expected to intervene in the proceedings unless the evidence would serve no conceivable strategic purpose." *State v. Anderson*, 2020 UT App 135, ¶ 31, 475 P.3d 967 (quotation simplified), *cert. denied*, 481 P.3d 1044 (Utah 2021). As we discuss, Trial Counsel had valid strategic reasons not to object to the introduction of the recordings. Accordingly, it was not plain error for the court to refrain from interfering with Trial Counsel's "strategic decision-making regarding" admission of the recordings. *See id.*

exhibits allowed the jury to hear Gourdin—in his own voice—clearly deny that he had murdered Victim, without Gourdin having to be subjected to cross-examination by the prosecution. During the interviews, Gourdin consistently maintained his innocence, and he did so in the face of robust and aggressive police tactics—including outright lies about the state of the evidence—designed to try to elicit a confession. Indeed, in the interviews, Gourdin readily acknowledged his criminal past, conceding to the interviewing officers that he might be a "criminal" who had "done a lot of messed-up things," but he consistently maintained that he had not had anything to do with Victim's murder. Trial Counsel had good reason to want the jury to hear Gourdin consistently deny his involvement in the murder, and admission of these interview recordings allowed Trial Counsel to accomplish that objective without subjecting Gourdin to cross-examination at trial. Thus, there was a clear strategic reason for Trial Counsel to forgo any objection to the admission of the interview recordings.

¶61　Gourdin asserts, however, that even if Trial Counsel had a strategic reason to forgo any objection to the admission of the recordings in their entirety, Trial Counsel should at least have made an effort to seek redactions by lodging objections to certain discrete portions of the recordings. Gourdin acknowledges—as he must—that portions of the recordings may have been admissible. *See* Utah R. Evid. 801(d)(2)(A) (stating that statements made by a party-opponent are "not hearsay"). But he believes that other parts of the interviews were subject to various evidentiary objections, and therefore Trial Counsel should at least have made an effort to excise those parts from the recordings that were played for the jury.

¶62　The first problem with this argument is that, although Gourdin does identify certain general topics that he believes were objectionable, he never specifies exactly which portions of the

recordings he thinks should have been redacted, making it difficult for us to assess the strength of his argument.

¶63    But more substantively, Trial Counsel had good reason to choose not to make even the more limited objections Gourdin now identifies. Many of those potential objections have to do with the tactics the officers used during the interviews. For instance, Gourdin claims that Trial Counsel should have objected to officers' "distortion of Gourdin's own statements regarding his activities on the day [Victim] was killed"; officers' allegedly inaccurate "statements on DNA longevity and testing"; officers' "accusations that Gourdin was changing his story"; officers' "unfounded opinions on drugs and their effects on people"; and officers' lies about the state of the DNA evidence. But as already noted, Trial Counsel had a solid strategic reason not to object to all of this: a reasonable attorney could very well have wanted the jury to hear about the officers' tactics in order to make Gourdin's consistent denials in the face of these tactics seem even more believable. And the officers, at trial, admitted that they had lied about the state of the DNA evidence during the interviews, and therefore the jury was not at risk of assuming that the statements the officers made about that evidence were true.

¶64    Two of the objections Gourdin now identifies do not have to do with police tactics, but in our view Trial Counsel had good reason to forgo those objections too. First, Gourdin asserts that Trial Counsel should have objected to any discussion, during the interviews, of any of Gourdin's prior bad acts, including evidence of his previous incarceration or evidence that he had been involved in altercations or confrontations with the residents of Tweakerville. Gourdin claims that this evidence made Gourdin seem like a violent person, and that it was subject to exclusion pursuant to rule 404(b) of the Utah Rules of Evidence. But Trial Counsel had reason not to object to this evidence as well. The fact that Gourdin had previously served time in prison helped bolster the defense narrative that police focused on Gourdin solely

because he was a parolee with a criminal past. And the fact that Gourdin was not on good terms with—and sometimes aggressively confronted—the residents of Tweakerville could be seen as helping Trial Counsel distance Gourdin from Tweakerville and humanize him as a protective father; indeed, the evidence showed that one of the confrontations occurred because Gourdin was upset when he learned that his young daughter had spent time at Tweakerville and he "didn't want [her] over there."

¶65    Second, Gourdin asserts that Trial Counsel should have objected to the portion of the interviews in which Gourdin describes Girlfriend's suspicion of him on the day of the murder. But Girlfriend herself testified to this, and thus the jury was already aware of these facts; under these circumstances, any objection to this portion of the interviews would almost certainly have been overruled.[14] *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶66    In short, we conclude that Trial Counsel had reasonable strategic reasons to decline to lodge any objection to the admission of the interview recordings. Accordingly, Gourdin has not carried his burden of demonstrating that Trial Counsel performed deficiently, and on that basis has failed to satisfy the first part of the *Strickland* test. We therefore reject Gourdin's first assertion that Trial Counsel rendered ineffective assistance.

## II. The DNA Evidence

¶67    Next, Gourdin claims that Trial Counsel rendered ineffective assistance in their handling of certain issues related to DNA evidence. Gourdin points to three ways in which he believes

---

14. And, for similar reasons, even if Trial Counsel had succeeded in excising from Gourdin's interview any reference to Girlfriend's suspicion of him, that would not have been reasonably likely to have made a difference in the outcome of the trial.

Trial Counsel performed deficiently in this regard: (1) "by failing to obtain the underlying data and notes from the DNA tests performed by the State"; (2) "by failing to consult a DNA expert regarding those tests and the data"; and (3) "by failing to present significant exculpatory DNA evidence" in the form of probabilistic genotype testing results. Each of these arguments implicates Trial Counsel's duty to investigate the facts and circumstances of the case. *See Strickland*, 466 U.S. at 690 (stating that defense attorneys have a "duty to investigate" the circumstances of their clients' cases). We agree with Gourdin, at least to some extent, on the first two points: that Trial Counsel rendered ineffective assistance by not requesting the underlying DNA files and by not consulting with an expert to help them understand the contents of those files. But we reject Gourdin's argument that Trial Counsel performed deficiently by electing not to retain an expert to run probabilistic genotype testing.

## A. Deficient Performance

¶68 Criminal defense attorneys have an obligation to reasonably and adequately investigate the facts of their clients' cases. *See id.*; *see also State v. J.A.L.*, 2011 UT 27, ¶ 28, 262 P.3d 1 ("We have repeatedly held that one of criminal defense counsel's most fundamental obligations is to investigate the underlying facts of a case."). This investigation then informs the strategic choices attorneys make about how best to defend the case; such choices are considered "virtually unchallengeable" as long as those choices are made "after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Thus, in order to put themselves in a position to make reasonable strategic decisions to which courts rightly defer, defense attorneys must conduct a reasonably thorough investigation of the case; indeed, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91; *see also State v. Griffin*, 2015 UT 18, ¶ 33, 441 P.3d 1166

(stating that defense counsel "has the duty to adequately investigate the underlying facts of the case because investigation sets the foundation for counsel's strategic decisions about how to build the best defense" (quotation simplified)); *State v. Templin*, 805 P.2d 182, 188 (Utah 1990) ("It is only after an adequate inquiry has been made that counsel can make a reasonable decision to call or not to call particular witnesses for tactical reasons.").

¶69     In this case, Trial Counsel made the decision not to request the notes, files, or data underlying the State's DNA experts' reports, as well as the decision not to consult with a DNA expert or to seek further DNA testing that the State had not undertaken. Trial Counsel offered various strategic reasons for truncating their investigation into the DNA issues in the case: they believed that eliciting testimony from the State's experts was more effective with juries than using their own experts, who they believed were often viewed as "hired guns," and they were concerned, after speaking with Gourdin, that "there was a risk that additional DNA investigations would not be favorable."

¶70     We agree with the State that, with regard to whether to seek additional DNA testing, including probabilistic genotype testing, Trial Counsel's strategic reasons were sound. Probabilistic genotype testing was brand-new in 2019; the crime lab was not even set up to conduct this kind of testing at that time, and Sorenson had only just then begun doing so. Sorenson's chief executive officer testified that he was unaware of any defense attorneys in Utah asking Sorenson to do probabilistic genotyping in 2019. For this reason alone, the State's argument—that it was not necessarily unreasonable for Trial Counsel to forgo exploring this type of testing—has considerable force.

¶71     But even if probabilistic genotype testing had been readily available in early 2019, Trial Counsel in this case had sound strategic reasons not to seek it. The DNA evidence that the State was set to present at trial was either exculpatory for Gourdin or

inconclusive. Trial Counsel was concerned, after speaking with Gourdin, that further testing might result in unearthing evidence that would be less favorable to Gourdin. In this situation, an attorney makes a reasonable choice by forgoing the opportunity for further and more detailed DNA testing. *See Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). We therefore conclude that Trial Counsel did not perform deficiently by electing not to pursue probabilistic genotype testing in this case.

¶72 We reach a different conclusion, however, when it comes to Trial Counsel's decision not to request the files, notes, and data underlying the State's witnesses' DNA reports. It is one thing to decide not to generate additional evidence that the State does not already have, especially where counsel is concerned that the additional evidence might be unfavorable. But it is another thing to decline to take steps to adequately understand the evidence that is already in the State's possession and about which the State's witnesses are scheduled to testify. Trial Counsel's decision not to request the relevant files—and their follow-on decision not to enlist the assistance of an expert to help them understand the contents of those files—left Trial Counsel in a position where they did not fully understand key portions of the State's evidence. All strategic decisions made after that—including the decision not to consult a DNA expert—were made "after less than complete investigation," and such decisions "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *See id.* Here, no reasonable professional judgments support Trial Counsel's decision not to request the files.

¶73 Trial Counsel's fear of unearthing new evidence unfavorable to Gourdin does not apply here: the files in question were already in the State's possession (or in the possession of its

experts), and their contents were presumably already known to the State and its experts. There was no additional marginal risk of unearthing new, unfavorable evidence simply by requesting the State's files. And the State proffers no other potential strategic reason Trial Counsel might have had for opting not to request the State's witnesses' DNA files.

¶74 Moreover, we find unconvincing Trial Counsel's statement, made during the remand hearing, that they didn't request the files because they were depending on the State's *Brady* obligation to disclose anything exculpatory. It is certainly a correct statement of the law that the State has an obligation to turn over to the defense any exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). But this reality does not absolve defense attorneys of their general investigatory obligation to ask the State to turn over the evidence it intends to present in support of its case. *See State v. Jarrell*, 608 P.2d 218, 225 (Utah 1980) ("Generally, evidence is not improperly withheld if the defense has knowledge of that evidence and defense counsel simply fails to request it."); *see also People v. May*, 745 P.2d 218, 221 (Colo. 1987) (en banc) ("It is the duty of the lawyer to . . . secure information in the possession of the prosecution and law enforcement authorities." (quoting *ABA Standards for Criminal Justice, Defense Function* § 4–4.1 (1986))); *Shields v. State*, 2020 WY 101, ¶ 50, 468 P.3d 1097 ("An investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. It follows that counsel must make some effort to learn the information in the possession of the prosecution and law enforcement authorities." (quotation simplified)); *cf. Cade v. State*, 658 So. 2d 550, 554 (Fla. Ct. App. 1995) (stating that, "since ours is a system that relies largely on the adversarial system for truth-seeking, it is dangerous to give all the tools to the [S]tate and hope it will do the right thing and always do it well").

¶75 We recognize, as noted above, that the absence of any reasonable strategic explanation for a defense attorney's conduct

does not necessarily lead to the conclusion that the attorney performed deficiently. *See State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350 ("[E]ven where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient."). In the end, "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable." *Id.* ¶ 35. Here, in our view, reasonable counsel would have requested the DNA files from the State. There was simply no other way for Trial Counsel to have fully understood the contents of the State's evidence against Gourdin, an understanding that was necessary to be able to make informed, reasonable strategic choices going forward.

¶76 Important to our conclusion in this case is the fact that the DNA evidence the State intended to present was, in large part, inconclusive. After all, the term "inconclusive" can mean a number of different things, and in this case the State intended to argue, from the "inconclusive" testing, that Gourdin's DNA might nevertheless be present on certain items of evidence. The trial court found, after the remand hearing, that there is a "difference between DNA evidence that 'excludes' a suspect and DNA evidence that is merely 'inconclusive,'" and that Trial Counsel understood that distinction. Trial Counsel was also aware, as early as February 2019 after the preliminary hearing, that the State intended to present "inconclusive" DNA testing as evidence that left open the possibility that Gourdin's DNA might be present. Indeed, Trial Counsel filed a motion in limine regarding this topic in the months leading up to trial. Where the critical DNA evidence in the case is in significant part "inconclusive"—as opposed to entirely exculpatory—and where the State intends to try to use that "inconclusive" evidence in its favor, it becomes important for the defense to seek disclosure of the underlying DNA files, which may contain further detail as to the reasons for the inconclusive nature of the evidence.

¶77 Had Trial Counsel asked for those files in this case, they would have soon discovered that they could not fully understand the contents of those files without the assistance of a DNA expert. For instance, the two documents discussed at some length above—Scientist 1's handwritten note and the Worksheet—are not comprehensible to a layperson or even to most experienced attorneys. The handwritten note contains a bunch of numbers arranged in rows and columns; it comes with no narrative explanation, and it would not be evident, to a person without scientific knowledge and training, that the document contains conclusions potentially helpful to Gourdin. Similarly, the Worksheet appears to be a page from a spreadsheet, again containing mostly numbers arranged in rows and columns. While the Worksheet does contain a few narrative words, it would likewise not be evident to laypersons that the document contains any conclusions helpful to Gourdin. There may be some lawyers who have the scientific training necessary to understand documents like these, but most don't. Most lawyers will need the assistance of scientifically trained experts to help them understand DNA-related documentation like this.

¶78 These realities led the American Bar Association, in 2007, to include in its "Standards for Criminal Justice" the admonition that "[e]xpert assistance should be provided . . . prior to and during trial if there is reason to believe that the prosecution will present DNA evidence or if expert assistance may lead to the discovery of relevant evidence." *ABA Standards for Criminal Justice: DNA Evidence* 90 (3d ed. 2007) https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/dna_evidence.pdf [https://perma.cc/T4S9-NR4A]. In support of this admonition, the ABA cited several cases from around the country discussing the complexity of DNA evidence and the reality that most attorneys are not able to fully understand such evidence without the assistance of a DNA expert. *See id.* at 91 (citing *Ex Parte Dubose*, 662 So. 2d 1189, 1196 (Ala. 1995) ("Given the complexity of DNA technology, it is

doubtful that a defense attorney will have the requisite knowledge to effectively [examine such evidence] without expert assistance.")). And the ABA cited another study that "indicated that experts will be needed in most [DNA] cases," even cases in which "the admissibility of the results" of the DNA testing "is not in question," because "there is still a need to review the quality of the laboratory work and the interpretation of results." *Id.* (quotation simplified). The ABA specifically referred to "mixture samples" as a topic that may be particularly difficult for defense attorneys to understand and interpret. *Id.* at 91–92. And it concluded by stating that "[a]dequate representation, therefore, often requires expert assistance" in DNA cases. *Id.* at 92.

¶79   In assessing attorneys' conduct in light of the Sixth Amendment's reasonableness standard, "[c]ourts frequently rely on the professional standards established by the [American Bar Association] when determining the relevant professional norms under the first prong of the *Strickland* analysis." *Menzies v. Galetka*, 2006 UT 81, ¶ 90, 150 P.3d 480; *see also Strickland*, 466 U.S. at 688 (recognizing that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable"). We therefore have no trouble concluding that reasonable attorneys who receive DNA evidence from the State that they can't adequately understand will usually need to seek expert assistance to help them adequately understand that evidence.

¶80   We acknowledge that the argument that counsel performed deficiently by failing to consult an expert is often a difficult argument for a defendant to make. In many cases, Utah appellate courts have rejected this type of argument, because defense attorneys are often able to articulate strategic reasons, developed after adequate investigation, not to seek the assistance of an expert witness. *See, e.g., McCloud v. State*, 2021 UT 51, ¶¶ 84–89, 496 P.3d 179 (concluding that the attorney "made a reasonable strategic decision to not consult or call experts"); *State v. Hales*,

2007 UT 14, ¶ 80, 152 P.3d 321 (stating that "an attorney may often provide adequate assistance without hiring an expert to do a separate examination of the evidence"); *State v. King*, 2017 UT App 43, ¶¶ 16–24, 392 P.3d 997 (concluding that the attorney did not perform deficiently by opting not to call or consult experts). But in this specific situation—where DNA evidence from the State exists and defense counsel are not able to adequately understand that evidence on their own—reasonable attorneys will usually need to seek the assistance of a consulting expert.

¶81 In this respect, the case before us is similar to *State v. Hales*, 2007 UT 14, 152 P.3d 321. In that case, an infant died from brain injuries and the defendant was convicted of murder. *Id.* ¶ 1. Our supreme court held that the trial attorney performed deficiently by opting not to have an expert review the infant's CT scans prior to trial. *Id.* ¶ 3. The attorney had been on notice, since the preliminary hearing, that the CT scans were "critical" to the State's case, yet the attorney chose not to obtain a qualified expert to review the scans. *Id.* ¶¶ 74, 76, 78. Some evidence on the CT scans—referred to as "changes in gray/white differentiation"—indicated that the infant's injuries had occurred earlier than his contact with the defendant. *Id.* ¶ 87. But a layperson—even an experienced attorney—wouldn't have been able to tell that from looking at the CT scans. Accordingly, the court held that the attorney had performed deficiently by failing to consult with a medical expert who could have helped the attorney understand the CT scans. *Id.* ¶¶ 82–83.

¶82 As in *Hales*, Trial Counsel here failed to take advantage of the "significant opportunity to discover crucial new information" that consultation with an expert would have presented. *See id.* ¶ 82. Had Trial Counsel consulted with an expert, they would have been able to interpret the handwritten note and the Worksheet, and they would have ascertained that the majority of the DNA on the cigarette butt was female and that Gourdin could be excluded as a DNA contributor to the cigarette butt.

¶83    The State contends that *Hales* is distinguishable because the CT scans in that case were "directly inculpatory" and central to the State's case, whereas here the DNA evidence was either exculpatory or inconclusive, and the State was using it "solely to show the completeness of its investigation." For two reasons, we find these arguments unpersuasive. First, whether the CT scans in *Hales* were inculpatory or exculpatory depended on which expert was asked. The State's case "was based, in large part, on expert interpretation of the CT scans." *Id.* ¶ 28. Yet the expert the defendant's appellate attorney hired opined that the scans showed that the infant "was not in [the defendant's] care when he was injured," a conclusion that renders the scans *exculpatory*. *Id.* ¶ 84. What matters more, however, is that the CT scans, like the underlying DNA files here, were left unanalyzed by the defense and therefore the State's position as to what they represented went unrebutted, at least in certain important particulars. Second, the State spent too much time on the DNA evidence at trial to plausibly claim that the only purpose for that evidence was to demonstrate the completeness of its investigation. Indeed, the State expressly argued, during closing argument, that the DNA evidence, although at best inconclusive, "doesn't let [Gourdin] off the hook" and that it left the door open that Gourdin's DNA might nevertheless have been present on certain items of evidence.

¶84    For all of these reasons, we conclude that Gourdin has not demonstrated that Trial Counsel performed deficiently by deciding not to pursue the opportunity for additional DNA testing, including probabilistic genotype testing. Trial Counsel has articulated reasonable strategic reasons for that decision. But we also conclude that, under the unique circumstances of this case—where the State intended to present DNA evidence, through experts, which was in large part "inconclusive," and intended to argue therefrom that Gourdin might nevertheless be implicated by the DNA evidence—Trial Counsel performed deficiently by not requesting the files, notes and data underlying the State's experts' DNA reports. We further conclude that, in this

situation, where parts of the DNA files were apparently not understandable to laypersons without expert assistance, Trial Counsel performed deficiently by not enlisting the assistance of a consulting expert to help them decipher the contents of the files. Reasonable counsel would have done those things in this case. Accordingly, Gourdin has met his burden of demonstrating deficient performance on those portions of his DNA-evidence ineffective assistance claim.

## B. Prejudice

¶85    Because we have concluded that Trial Counsel performed deficiently in not requesting the DNA files and not hiring an expert to help them understand those files, we must consider whether that deficient performance prejudiced Gourdin. After all, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To succeed on his ineffective assistance claim, Gourdin must show that "there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150, *cert. denied*, 481 P.3d 1043 (Utah 2021). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694.

¶86    "Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86; *see also State v. Soto*, 2022 UT App 107, ¶ 25, 518 P.3d 157 ("Under a counterfactual analysis, we consider whether, in the absence of improperly admitted [or misleading] evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." (quotation simplified)), *cert. denied*, 526 P.3d 827 (Utah 2022).

¶87 We begin our prejudice analysis by describing the evidence that has since come to light and that was not presented during Gourdin's trial. As we see it, that evidence consists of these two things: (1) that the DNA "major profile" on the cigarette butt was female, and therefore was not Gourdin's; and (2) that, if Scientist 1 had completed his back-of-the-envelope analysis, he would have concluded that Gourdin's DNA was also not present in the "minor profile" on the cigarette butt either. Thus, the new evidence operates to completely exclude Gourdin from the cigarette butt found in Victim's backyard.

¶88 The question presented is whether it is at least reasonably probable that the outcome of Gourdin's trial would have been different if the jury had learned that Gourdin could be completely excluded as a contributor to the DNA on the cigarette butt. After examining the record, we answer that question in the affirmative.

¶89 Prior to trial, it was far from clear that the cigarette butt would end up to be all that big of a deal in the grand evidentiary scheme of this case. Indeed, Lead Detective testified at the remand hearing that, during his investigation of the case, the cigarette butt did not seem like especially valuable evidence because "frankly, an animal, a bird could have picked that up, could have moved that from anywhere," so to him, at least at the time, "that cigarette [butt] didn't hold a lot of value as far as evidence." Certainly, prosecutors could have made a decision to de-emphasize the cigarette butt and to try the case largely on the strength of other evidence. But that is not what happened.

¶90 As the trial ended up playing out, the cigarette butt became an important part of the State's case. As noted already, *see supra* ¶ 34, the State brought up cigarettes generally or the cigarette butt specifically with twelve different witnesses, and the cigarette butt was discussed on over ninety-five different pages of the trial transcript. The State emphasized the cigarette-butt evidence during its closing argument, noting that the DNA evidence on

that score was "inconclusive" but nevertheless arguing that other evidence in the case "suggest[ed] that" the cigarette butt was Gourdin's. The State's arguments on this point were remarkably specific. After pointing out that the butt was the same brand as the cigarettes Gourdin was known to smoke, and that other red-striped Camels were found in the backyard of Gourdin's house, the State theorized that Gourdin had spent some of the $20 he earned mowing lawns on the morning of the murder on a pack of red-striped Camels purchased at the convenience store, and that he and others smoked that pack on May 21 before switching to blue-striped Camels on May 22. The State summed up its argument on this point by offering its view that "the evidence is very suggestive of the fact that Mr. Gourdin did drop that red-striped Camel . . . cigarette in [Victim's] yard."

¶91    When the State emphasizes evidence to this extent in closing argument, that is a very good clue that the evidence mattered. *See Ellis*, 2018 UT 2, ¶ 43 (stating that one factor leading to the conclusion that the admission of evidence mattered was that the "prosecution emphasized [it] during closing argument"); *see also State v. Burnett*, 2018 UT App 80, ¶ 40, 427 P.3d 288 (stating that the "prosecution's emphasis in closing argument" of particular evidence "is not only an indicator that the State considered" that evidence "important corroborative evidence, but also that the [evidence] was important enough to make a difference"), *cert. denied*, 432 P.3d 1232 (Utah 2018).

¶92    We note also that the jurors seem to have picked up on the State's emphasis of the cigarette-butt evidence. Of the twenty-five questions the jury asked during the trial, seven were about cigarettes. For example, jurors asked about the brand of cigarette found at the crime scene and at the house where Gourdin was staying. Jurors also asked whether cigarettes can be DNA tested, whether the "[C]amel cigarettes with the red stripe and blue" were "found anywhere else in the neighborhood," and what type of brand of cigarettes were found in Gourdin's "property from the

jail." These juror questions are also an indication that the cigarette-butt DNA evidence was an important part of the trial. *Cf. McDaniel v. Brown*, 558 U.S. 120, 136 (2010) (per curiam) (noting that "DNA testing can provide powerful new evidence unlike anything known before," and that such evidence is often "persuasive[] . . . in the eyes of the jury" (quotation simplified)); *State v. Johnson*, 862 N.W.2d 757, 774 (Neb. 2015) (noting "the significance that jurors will likely attach to DNA evidence").

¶93    Finally, we reject the State's assertion that the evidence it presented at trial—aside from the now-discredited "inconclusive" cigarette-butt DNA evidence—was so overwhelming in favor of guilt as to render the new evidence inconsequential. The State's evidence did not include any fingerprints or inculpatory DNA evidence, and it did not include any testimony from anyone who had witnessed the murder. No evidence placed Gourdin at the crime scene during the window of time in which the murder occurred. And Gourdin did not confess, despite considerable pressure from police to do so. As such, the State's case ended up being largely circumstantial, and was built on three pillars. First, the State relied on evidence from Girlfriend and various neighbors that Gourdin had been acting erratically, even suspiciously, on the day of the murder. Second, the State relied on the fact that Gourdin lived near Victim and had been at her house earlier that same morning. And third, the State relied on the testimony of the two jailhouse informants. To be sure, this evidence does support the State's position that Gourdin committed the murder. But in our view, the State's case was not strong enough to render inconsequential the new evidence regarding the cigarette butt.

¶94    In the end, our confidence in the outcome of the trial, as it was presented to the jury, is undermined by the new evidence Gourdin has unearthed. Had this jury—the one to whom the State argued that the cigarette butt found in Victim's yard represented important inculpatory evidence—learned that Gourdin was

excluded as a possible contributor of DNA to that cigarette butt, it is at least reasonably probable that it would have reached a different verdict. Thus, Gourdin has demonstrated that he was prejudiced by Trial Counsel's deficient performance.

CONCLUSION

¶95  We reject some of Gourdin's claims that Trial Counsel rendered constitutionally ineffective assistance. In particular, Gourdin has not shown that Trial Counsel performed deficiently by opting not to object to the State's introduction of the recorded interviews or by opting not to pursue probabilistic genotype testing. But on the facts of this particular case, we find merit in Gourdin's assertion that Trial Counsel rendered ineffective assistance by opting not to request the DNA files from the State's experts and by not seeking the assistance of an expert in helping them understand the contents of those files. On that basis, we reverse Gourdin's conviction and remand the case for further proceedings, including a new trial, consistent with this opinion.

———————